IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUSAN ELIZABETH KUHN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 17 C 6454 |
| v. ) | |
| ) | Magistrate Judge Sidney I. Schenkier |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Susan Elizabeth Kuhn, moves for reversal and remand of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") (doc. # 15). The Commissioner has filed a cross-motion for summary judgment, asking this Court to affirm the Commissioner's decision (doc. # 23). The matter is now fully briefed. For the following reasons, we affirm the Commissioner's decision.

**I.**

Ms. Kuhn applied for DIB on April 9, 2013, alleging an onset date of March 31, 2006 (R. 181), which was later amended to January 1, 2011 (R. 204). Her date last insured ("DLI") was December 31, 2011 (R. 20). After her claim was denied initially and on reconsideration, Ms. Kuhn requested and received a hearing before an Administrative Law Judge ("ALJ"). The hearing began on November 18, 2014, and was reconvened on December 1, 2015, to give Ms. Kuhn time to obtain records preceding her DLI (R. 1311-12). On June 28, 2016, the ALJ issued a decision denying Ms. Kuhn's claim for benefits (R. 20-27). The Appeals Council denied Ms. Kuhn's

---

[1] On October 25, 2017, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 10).

request for review of the ALJ's decision, making the ALJ's ruling the final decision of the Commissioner (R. 1). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

Ms. Kuhn worked as an accountant from 1991 to 1999, and then as a pricing consultant from 1999 until March 31, 2006, when, at age 47, she stopped working because her department moved to Tennessee (R. 44, 209-10). Ms. Kuhn was offered a job in Tennessee, but she decided to stay in Chicago to care for her mother, who had suffered several strokes (R. 1302-03). Ms. Kuhn stayed home taking care of her mother from 2006 until late 2010, when her mother passed away (R. 1309).

### A.

Ms. Kuhn experienced low back pain since 1999; at that time, she received pain medication and physical therapy (*see, e.g.* R. 1239, 1245-52). Her back pain recurred in 2001; between 2001 and 2006, Ms. Kuhn received epidurals and oral medication for her pain, and she occasionally missed work due to her back issues (R. 45, 1282). During this time, Ms. Kuhn also had occasional right knee pain, for which she received steroid injections from John H. Lyon, M.D. (R. 827). When she stayed home to care for her mother, Ms. Kuhn said that she did not seek much treatment because she was able to "baby [her] back," including by lying down if needed (R. 1304-06). In February 2008 and April 2009, Ms. Kuhn's primary care physician, Robert Zimmanck, Jr., M.D., noted that Ms. Kuhn had occasional back pain, which worsened when she lifted her mother; her medications were listed as tizanidine (a muscle relaxant), Celebrex (an NSAID), and tramadol (a narcotic) (R. 341, 346).

In the summer of 2009, Ms. Kuhn experienced sudden sensorineural hearing loss in her right ear (R. 311). On August 18, 2009, Dennis Moore, M.D., performed surgery on her right ear;

2

by January 2011, testing showed Ms. Kuhn had recovered almost all her hearing in her right ear, although she reported a persistent hissing sound (R. 307-11). An audiogram taken one year later showed continued improvement (R. 439).

On January 6, 2011, Ms. Kuhn visited Dr. Zimmanck for a comprehensive medical examination; he noted that she "didn't follow up recently due to [the] death of her mother recently" (R. 335). Ms. Kuhn reported pain in her lower back that radiated to her buttocks and mid-thighs, which prevented her from shopping, doing housework or standing on her feet for a long time, and her straight leg test was positive bilaterally (R. 335-37). On January 11, 2011, an MRI of Ms. Kuhn's lumbar spine showed moderate lumbar degenerative disc disease with mild scoliosis and small disc protrusion/herniation "of questionable significance" (R. 369-70). From February 4 through April 19, 2011, Ms. Kuhn received physical therapy; by March 4, 2011, her back pain had decreased to a two or three out of ten; by April 19, 2011, she reported "feeling much better," and her physical therapist determined that her physical therapy goals were met (R. 1117-25).

On March 10, 2011, Ms. Kuhn reported to Dr. Zimmanck that she was "still experiencing some back pain," and there was motor weakness in both legs, but no tingling or numbness (R. 332). Ms. Kuhn reported that physical therapy improved her symptoms, and Dr. Zimmanck determined that despite the abnormal MRI from January 2011, they would pursue "conservative therapy for now" (R. 332-34). At a follow-up appointment on June 9, 2011, Ms. Kuhn reported feeling "better and stronger" with physical therapy (R. 329). Her musculoskeletal and neurological examinations were normal, and her medications remained the same (R. 329-30). On September 9, 2011, Ms. Kuhn reported to Dr. Zimmanck that she lost weight and could do more activity, such as walking and yoga, though her back was "still sore" (R. 326). On December 16, 2011, Ms. Kuhn had "occas[ional]" back pain radiating down her thighs; her walking was limited because her back

3

became sore (R. 323). Throughout 2011, her medications were listed as tizanidine, Celebrex and tramadol (R. 324, 327). On March 19, 2012, after Ms. Kuhn's date last insured (December 31, 2011), Dr. Zimmanck prescribed Elavil (a nerve pain medication) to attempt to address Ms. Kuhn's "chronic" back pain (R. 471, 474). Elavil eased her back pain but made her very groggy; on July 31, 2012, Dr. Zimmanck decreased the dosage (R. 477, 479).

On April 1, 2012, Ms. Kuhn injured her right knee (R. 475-76). An April 23, 2012 MRI showed degenerative changes and a meniscus tear in her knee (R. 828). Ms. Kuhn returned to Dr. Lyon to receive injections in her right knee (R. 826), but they determined that non-surgical treatment was not working, and Dr. Lyon performed total right knee replacement surgery on August 20, 2012 (R. 487, 501). On December 11, 2012, Ms. Kuhn told Dr. Lyon that she was very happy with the outcome of her surgery from a pain and functional standpoint (R. 1107). However, she had pain in her left knee, for which Dr. Lyon gave her an injection (R. 1107-11).

On March 1, 2013, Ms. Kuhn reported to Dr. Zimmanck that she wanted to stop taking Elavil because it made her sleepy; she continued to take tramadol and Celebrex for "occas[ional] back pain" (R. 484). On April 9, 2013, Dr. Zimmanck filled out a physical residual functional capacity ("RFC") questionnaire; he noted that Ms. Kuhn reported daily lower back pain, and his clinical findings showed she had a "tender back" (R. 450). Dr. Zimmanck opined that due to pain, Ms. Kuhn could sit and stand for 30 minutes at a time for no more than two hours total in an eight-hour workday, and she would likely miss more than four days per month of work; he opined that these limitations extended eight years prior to his evaluation (R. 450-52). On June 19, 2013, a non-examining state agency physician found that Ms. Kuhn's medical records showed her deficits stemmed from medical conditions that post-dated her DLI (R. 88, 90).

From April 5, 2013 through May 5, 2013, Ms. Kuhn received physical therapy; on May 5, 2013, her therapist noted that her pain level had decreased and was manageable (R. 632-33). From July 2013 through November 2013, Ms. Kuhn received frequent chiropractic treatment, including electrical stimulation, for chronic low back pain and left foot/ankle pain (R. 522-608). At these visits, Ms. Kuhn regularly demonstrated tenderness and mild pain over her spine and spasms in her back were also noted; her pain level fluctuated (*Id.*). On September 4, 2013, Ms. Kuhn reported to Dr. Zimmanck that she had gained weight because she was not walking much due to pain in her knee and back (R. 615-18). On November 21, 2013 and December 19, 2013, Ms. Kuhn received epidural steroid injections from Mehul P. Sekhadia, D.O., for her pain (R. 609-11, 708).

On January 7, 2014, Dr. Zimmanck filled out a spinal disorders form for the Disability Determination Services based on Ms. Kuhn's lumbar radiculopathy and facet arthritis (R. 635). Her primary complaint was pain; she took Celebrex, tramadol and tizanidine but they were not much help (R. 637). Dr. Zimmanck noted she had limited range of motion in her lumbar spine and occasional back spasms; he opined she could not sit or stand for more than two hours at a time (R. 635-36). On February 6, 2014, a state agency physician reviewed the additional medical evidence and affirmed the June 2013 finding that Ms. Kuhn did not have a severe impairment prior to her DLI (R. 96). The state agency physician further found Dr. Zimmanck's opinion that Ms. Kuhn's impairments went back eight years was not supported by his own medical records (*Id.*).

On March 11, 2014, she received another epidural steroid injection from Dr. Sekhadia (R. 718). On April 8, 2014, Dr. Sekhadia noted Ms. Kuhn continued to report severe pain even though her spine was stable and she was neurologically intact (R. 969-70). In May 2014, Ms. Kuhn sought treatment with Shaun O'Leary, M.D. Ph.D., a neurosurgeon (R. 640-43). On July 24, 2014, Dr. O'Leary performed minimally invasive surgery at the L5-S1 level of Ms. Kuhn's back (R. 663).

Following physical therapy, on November 3, 2014, Dr. O'Leary noted she was "doing great" (R. 651, 728, 732, 776). During 2015, however, Dr. Zimmanck noted that Ms. Kuhn continued to complain of back and knee pain, and his examination in August 2015 showed she had a slightly abnormal gait and positive straight leg test on the right (R. 1201, 1203).

On May 5, 2014, Ms. Kuhn was diagnosed with Bipolar II disorder (R. 1170). She began receiving psychotherapy from Robin Lacey, Ph.D., that month, and in July 2014, she was prescribed lithium from a psychiatrist (R. 788-93). Ms. Kuhn continued to meet regularly with her psychiatrist to adjust her lithium dosage, and she continued to receive psychotherapy beyond the date of her second hearing before the ALJ (*see* R. 1158-63, 1175-82, 1195, 1234).

## B.

Two non-examining medical experts testified at Ms. Kuhn's hearing before the ALJ on December 1, 2015. Ashok Jilhewar, M.D., an internist, reviewed Dr. Zimmanck's finding on January 6, 2011, that Ms. Kuhn had a bilateral positive straight leg raising test; however, because Dr. Zimmanck's report did not state the location of the pain or how the test was done (sitting or supine), Dr. Jilhewar stated that it could not be interpreted properly (R. 71-73). In addition, Dr. Jilhewar noted that there was no mention of a straight leg raising test at Ms. Kuhn's follow-up appointment with Dr. Zimmanck on March 10, 2011 (*Id.*). Dr. Jilhewar also reviewed the medical reports post-dating Ms. Kuhn's DLI, and he acknowledged that "there has been a progression of her low back pain" and knee problems, including right knee surgery in August 2012 and back surgery in May 2014 (R. 74-76). Dr. Jilhewar also reviewed a medical report from March 1, 2013, that indicated Ms. Kuhn was considered morbidly to seriously obese (R. 78).

Dr. Michael Carney, Psy.D., a licensed clinical psychologist, also testified at the hearing. Dr. Carney acknowledged that Ms. Kuhn was struggling with pain issues and frustration, and that

chronic pain could lead to depression and a sense of helplessness and hopelessness (R. 68- 70). However, because Ms. Kuhn's mental health records began on May 5, 2014, Dr. Carney testified that it was very hard to say that her mental health problems began prior to her DLI of December 31, 2011 (R. 67-68).

## C.

In her written opinion, dated June 23, 2016, the ALJ determined that from her alleged onset date through her date last insured,[2] Ms. Kuhn had the following medically determinable physical impairments – back pain, mild dextroscoliosis and moderate degenerative disc disease of the lumbar spine, and hearing loss (R. 22). However, at Step 2, the ALJ found that none of these impairments, alone or in combination, were severe because they did not significantly limit her ability to perform basic work activities for 12 consecutive months (*Id.*). The ALJ found no evidence that Ms. Kuhn had mental impairments before her date last insured, as the first indication of them appeared in medical records in May 2014, nearly two-and-one half years after the DLI (R. 26). Where the ALJ finds a claimant does not have a severe medically determinable impairment or combination of impairments that meets the duration requirement, the ALJ will find that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). Therefore, the ALJ denied Ms. Kuhn's application for benefits at Step 2 and did not proceed through the rest of the five-step sequential evaluation process.

The ALJ found that during the relevant time frame, "there is evidence in the record of degenerative changes consistent with complaints of back pain as well as conservative treatment"

---

[2]Although the ALJ recognized that Ms. Kuhn amended her onset date from March 31, 2006 to January 1, 2011, throughout the opinion the ALJ refers to the alleged onset date as March 31, 2006 (R. 21-22). As the amended alleged onset date is included within this range, this typographical error would not change the ALJ's opinion.

7

(R. 24).³ The ALJ recognized that "[p]hysical examination showed one occasion of lumbar tenderness and positive straight leg raise bilaterally, with no scoliosis and full strength" (*Id.*). However, the ALJ noted that the January 2011 MRI led to a recommendation of only "conservative therapy" to manage Ms. Kuhn's back pain, and Ms. Kuhn reported feeling "better and stronger" after physical therapy, despite some occasional back pain and leg weakness (*Id.*). In addition, Ms. Kuhn reported she was able to engage in more activities and do some walking for exercise (*Id.*). Regarding Ms. Kuhn's hearing loss issues, the ALJ pointed to audiometry results that showed Ms. Kuhn had recovered almost all her hearing by her alleged onset date of January 2011, and her hearing showed continued improvement through January 2012, despite some hissing sounds that persisted (R. 24-25).

The ALJ also reviewed medical evidence that post-dated Ms. Kuhn's DLI, including her testimony that although her 2012 knee surgery helped with her pain, she now has pain in her other knee and back pain (R. 24). However, the ALJ found that Ms. Kuhn's statements concerning the intensity, persistence and limiting effects of these conditions during the period ending in 2011 was "not entirely consistent" with the evidence in the record (*Id.*). The ALJ determined that "the medical evidence, activities of daily living, and history of conservative treatment" that preceded the DLI weighed against inferring that any post-DLI evidence showed Ms. Kuhn was more impaired before December 31, 2011 (R. 25).⁴ Although the state agency physicians had opined there was insufficient evidence to evaluate Ms. Kuhn's impairment before her DLI, the ALJ found

---

³Plaintiff notes in her memorandum that the ALJ stated that Ms. Kuhn's impairments did not result in greater limitations than those given in the RFC, despite the fact that the ALJ did not assign Ms. Kuhn an RFC because she determined that Ms. Kuhn did not have a severe impairment (doc. # 16: Pl.'s Br. at 7, citing R. 24). We agree with plaintiff that this was incorrect, but we find that this error did not affect the ALJ's Step 2 determination.

⁴Ms. Kuhn notes that the ALJ stated that much of the evidence she submitted that post-dates December 31, 2011 is "not relevant to a finding of disability" (Pl.'s Br. at 7, citing R. 25). However, the ALJ did not merely disregard post-DLI evidence. Rather, the ALJ reviewed and discussed that evidence, and concluded that it was not persuasive as to the severity of Ms. Kuhn's impairments before her DLI.

that the evidence "was sufficient to make a determination of the severity of the claimant's impairments prior to the date last insured" (R. 26).

The ALJ gave Dr. Zimmanck's April 2013 physical RFC opinion little to no weight because the ALJ found it was (1) "unsupported by the record as a whole;" (2) "inconsistent with his contemporaneous treatment notes;" and (3) "appear[s] to be based upon claimant's subjective representations" (R. 25). The ALJ explained that Dr. Zimmanck's treatment notes only "showed abnormalities during one examination during the relevant time period;" otherwise, his treatment notes during that time documented Ms. Kuhn's reports of mild to moderate pain and "significant symptom improvement with treatment," despite requiring only "conservative care" (*Id.*). The ALJ also suggested that Dr. Zimmanck's 20-plus year treatment relationship with Ms. Kuhn may have motivated him to try to help Ms. Kuhn obtain benefits (R. 25-26). The ALJ gave no weight to a spring 2001 opinion that Ms. Kuhn was disabled because it was "too remote in nature," nearly 10 years prior to the amended alleged onset date (R. 25).

By contrast, the ALJ gave Dr. Jilhewar's opinion "significant weight" (R. 26). The ALJ noted that Dr. Jilhewar considered evidence both before and after Ms. Kuhn's DLI, and determined that before her DLI, Ms. Kuhn's chronic low back pain and degenerative disc disease did not cause the severe symptoms and functional limitations indicated in Dr. Zimmanck's RFC opinion (*Id.*). Therefore, the ALJ found Ms. Kuhn was not disabled as defined in the Social Security Act at any time from her alleged onset date through December 31, 2011, her date last insured (R. 27).

### III.

Courts review ALJ decisions deferentially to determine if they were supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stephens v. Berryhill*, 888

F.3d 323, 327 (7th Cir. 2018) (internal citations and quotations omitted). "In rendering a decision, the ALJ must build a logical bridge from the evidence to her conclusion. Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Id.* Ms. Kuhn argues that the ALJ's opinion should be reversed and remanded for failure to adequately address Dr. Zimmanck's RFC opinion and her osteoarthritis of the knees, obesity and credibility (doc. # 16: Pl.'s Br. in Supp. of Mot. for Summ. J. at 11-13).[5] We address these arguments in turn.

### A.

It is undisputed that Dr. Zimmanck was Ms. Kuhn's treating physician for approximately two decades, beginning years before her alleged onset date of January 1, 2011, and continuing long after her DLI of December 31, 2011. Ms. Kuhn contends that the ALJ erred in rejecting Dr. Zimmanck's physical RFC opinion because she did not adequately explain how his opinion was inconsistent with other evidence in the record (Pl.'s Br. at 8-9). We disagree.

"[T]hough treating physician[] opinions . . . are usually entitled to controlling weight, an ALJ may discredit the opinion if it is inconsistent with the record," including the physician's own notes. *Winsted v. Berryhill*, 915 F.3d 466, 472 (7th Cir. 2019) (internal citations omitted). Here, the ALJ explained that Dr. Zimmanck's April 2013 physical RFC opinion was inconsistent with his treatment notes that only "showed abnormalities during one examination during the relevant time period" (R. 25) -- the January 6, 2011 appointment that Ms. Kuhn references as corroboration for Dr. Zimmanck's RFC opinion (doc. # 25: Pl.'s Reply at 2-3). The ALJ reviewed other treatment notes from before Ms. Kuhn's DLI, both from Dr. Zimmanck and physical therapists, and found

---

[5] Plaintiff does not challenge the ALJ's finding that her alleged mental impairments were not severe, and so we do not further discuss that finding.

that these showed that Ms. Kuhn needed only conservative treatment to obtain "significant symptom improvement" (R. 25). We find plaintiff's challenges to the ALJ's analysis unpersuasive.

*First*, Ms. Kuhn contends that Dr. Zimmanck's RFC opinion is corroborated by other medical and physical therapy reports from 2011, which show that despite improvement, she continued to have "some back pain and weakness" and "occasional[]" pain radiating down to her knees that required her to take medications such as Celebrex and tramadol (Pl.'s Reply at 3). Moreover, Ms. Kuhn contends that the ALJ does not explain what she meant by "conservative" treatment (*Id.* at 3-4).

In determining that the medical records were inconsistent with Dr. Zimmanck's RFC opinion, the ALJ reviewed each of his treatment notes from 2011 (R. 24, citing Ex. 1F/23, 26, 29, 32-33, 37 and Ex. 5F/12, 14, 20). The ALJ recognized that those records showed Ms. Kuhn still had occasional back pain, but also that with physical therapy and medication (including Celebrex and tramadol), Ms. Kuhn's pain level decreased, she felt better and stronger, and she was able to engage in more activities (R. 24). Based on these observations, the ALJ noted that Dr. Zimmanck determined Ms. Kuhn was able to manage her pain with "conservative" therapy (*Id.*, citing 1F/32-33). Although neither Dr. Zimmanck nor the ALJ explicitly defined conservative therapy, it obviously refers to Ms. Kuhn's treatment with physical therapy and medication rather than more invasive procedures. The Seventh Circuit has also referred to such treatment as "conservative." *See, e.g., Hall v. Berryhill*, 906 F.3d 640, 641 (7th Cir. 2018) (describing physical therapy as "conservative treatment"); *Johnson v. Berryhill*, 745 F. App'x 247, 249-50 (7th Cir. 2018) (affirming ALJ's decision where ALJ gave little weight to a doctor's opinion that was not consistent with the "conservative nature of treatment," including medications and exercise); *Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018) (describing conservative course of treatment as

11

including physical therapy and drugs such as gabapentin, tizanidine, hydrocodone, morphine and Percocet).

*Second*, Ms. Kuhn argues the ALJ did not adequately review evidence from both before and after her DLI, which she contends was consistent with Dr. Zimmanck's RFC opinion (Pl.'s Br. at 10-11). Ms. Kuhn points to medical reports from 1999, 2001, 2004, 2013 and 2014, which showed she received epidural steroid injections for her back pain (*Id.* at 10). "But it is evident from the ALJ's decision that she did not 'fail to consider' this evidence, but instead she examined it as required and subsequently concluded that the evidence was irrelevant, because it did not address the correct time period." *Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008). As in *Eichstadt*, the ALJ here reviewed reports from before and after Ms. Kuhn's DLI, including a doctor's report from 2001, Ms. Kuhn's testimony that she had back and knee problems between 2001 and 2006 that caused her to occasionally miss work, her lack of treatment between 2006 and 2010, her knee replacement surgery in 2012 (which occurred after an injury in April 2012, after her DLI), and Dr. Zimmanck's opinion from April 2013 (R. 24-25). The ALJ was not persuaded that this evidence showed that Ms. Kuhn's impairments were severe between her alleged onset date and DLI, and we find this determination was reasonable in light of the remoteness of the evidence preceding her alleged onset date and the evidence that some of her symptoms arose after her DLI.

*Third*, Ms. Kuhn contends that the ALJ did not explain how Dr. Jilhewar's hearing testimony – which the ALJ accorded significant weight – was inconsistent with Dr. Zimmanck's RFC opinion (Pl.'s Br. at 8-9). Ms. Kuhn contends that because Dr. Jilhewar testified there had been a "progression" of her low back pain after her DLI, "[t]his progression would therefore have continued throughout 2012 for the twelve months subsequent to DLI" (*Id.*, citing R. 74). To the contrary, Dr. Jilhewar testified that the progression of Ms. Kuhn's back pain became evident long

after her DLI, from a July 2013 MRI and follow-up treatment culminating in back surgery in May 2014 (R. 74-75). Prior to Ms. Kuhn's DLI, Dr. Jilhewar found a "significant gap of many years" in treatment between 2006 and 2011. In 2011, he found no significant abnormal imaging results, and only one indication from Dr. Zimmanck of abnormal findings, a positive straight leg raising test in January 2011, which was not a useful measure of Ms. Kuhn's limitations because it did not specify where the pain was or how the test was conducted (R. 71-73). We find the ALJ's decision that Dr. Zimmanck's opinion was inconsistent with other evidence in the record was supported by substantial evidence.[6]

## B.

An ALJ's determination at Step 2 that a claimant's impairments are not severe is generally "'a *de minimis* screening for groundless claims.'" *Meuser v. Colvin*, 838 F.3d 905, 911 (7th Cir. 2016) (quoting *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016)). In this case, the ALJ's Step 2 finding was outcome determinative. The ALJ found Ms. Kuhn had the following medically determinable impairments through her date last insured of December 31, 2011 -- back pain, mild dextroscoliosis of the lumbar spine, moderate degenerative disc disease of the lumbar spine and hearing loss -- but that none of these impairments or combination of impairments were severe (R. 22); *i.e.*, they did not "significantly limit [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). Plaintiff contends that the ALJ erred by failing to include osteoarthritis of the knees, obesity, herniated disc of the lumbar spine and degenerative joint

---

[6]We agree with Ms. Kuhn that the ALJ's statement that Dr. Zimmanck may have been motivated to try to help Ms. Kuhn obtain benefits was speculative and not based on the evidence in the record (Pl.'s Br. at 10; Pl.'s Reply at 6). "If the ALJ somehow found it necessary to offer such a view, he needed to root the observation in specific record evidence—for example, an express statement in a physician's treatment notes." *Hall*, 906 F.3d at 643-44. "Instead, the ALJ broadly speculated—with no citation to any portion of the record," *id.* at 644, of "the possibility the treating physician may be motivated to help his or her patient" (R. 25). The Seventh Circuit has "discourage[d] such stray, unsupported conjecture." *Id.* Nevertheless, as in *Hall*, we find this error "do[es] not undermine the ALJ's broader conclusion that Dr. [Zimmanck's] opinions were inconsistent with the opinions from other doctors." *Hall*, 906 F.3d at 644.

disease as medically determinable impairments in her Step 2 analysis (Pl.'s Br. at 8, 11-12). We address each of Ms. Kuhn's allegations of error in turn.

*First*, Ms. Kuhn's claim of error based on the ALJ's omission of herniated disc of the lumbar spine and degenerative joint disease at Step 2 is without merit. We agree with the Commissioner that "the ALJ otherwise addressed her back impairment by assessing her with back pain, mild dextroscoliosis of the lumbar spine, and moderate degenerative disc disease of the lumbar spine" (Gov.'s Mem. in Supp. of Mot. for Summ. J. at 3). The ALJ reviewed all imaging of Ms. Kuhn's spine as well as treatment notes from Dr. Zimmanck and physical therapy regarding her back during the relevant time period.[7] Dr. Zimmanck's later 2013 diagnosis of herniated disc and degenerative joint disease based on this medical evidence would not change the ALJ's determination that Ms. Kuhn did not have a severe back impairment during the relevant time frame, which ended on December 31, 2011.

*Second*, we find no error in the ALJ's omission of osteoarthritis of the knees as a medically determinable impairment at Step 2. Ms. Kuhn contends that Dr. Lyon's treatment in 2005 and then again in May 2012, followed by total knee replacement surgery in August 2012, "strongly suggest the right knee problems began in 2005 and obviously continued thereafter until the surgery 08/20/12, less than nine months prior to DLI" (Pl.'s Reply at 8; Pl.'s Br. at 11-12). This assertion is belied by the evidence, or lack thereof. The first mention of knee problems after 2005 was Dr. Zimmanck's report from April 20, 2012, which noted that Ms. Kuhn injured her right knee on April 1, 2012 (R. 475), and Dr. Lyon's treatment notes from May 2012 stated Ms. Kuhn had no

---

[7]Moreover, back pain and degenerative disc disease of the lumbar spine likely include herniated disc of the lumbar spine and degenerative joint disease. According to the Mayo Clinic, "[d]isk herniation is most often the result of a gradual, aging-related wear and tear called disk degeneration," and in degenerative joint disease of the spine, disks narrow and worsen over time. https://www.mayoclinic.org/diseases-conditions/herniated-disk/symptoms-causes/syc-20354095; https://www.mayoclinic.org/diseases-conditions/osteoarthritis/symptoms-causes/syc-20351925.

14

knee pain between 2005 and April 2012 (R. 826). The ALJ recognized Ms. Kuhn had knee replacement surgery later in 2012 (R. 24), but Ms. Kuhn has not put forward evidence to support her claim that she had a medically determinable knee impairment between her alleged onset date and her date last insured. *See, e.g.*, *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011) (the claimant bears the burden of proof in each of the first four steps of the five-step analysis).

*Third*, we find that any error in the ALJ's decision not to include obesity in her Step 2 analysis was harmless. As Ms. Kuhn notes, her body mass index ("BMI") was within the obese range throughout 2011 and beyond (Pl.'s Br. at 13). It is well-settled that ALJs must consider the impact of obesity when evaluating the severity of other impairments. *Stephens*, 888 F.3d at 328. However, "an ALJ's failure to explicitly consider an applicant's obesity is harmless if the applicant did not explain how her obesity hampers her ability to work." *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015) (internal citations and quotations omitted). Like the claimant in *Stepp*, Ms. Kuhn "has made no attempt at such an explanation here," *Id.*, and there is no evidence that Ms. Kuhn's obesity worsened or altered her functional abilities.[8] As a result, any error on the part of the ALJ in neglecting to discuss Ms. Kuhn's obesity was harmless.

### C.

The ALJ considered Ms. Kuhn's testimony at the hearings, including that she did not receive treatment between 2006 and 2010 and had knee replacement surgery in 2012, and concluded that Ms. Kuhn's "medically determinable impairments could have been reasonably expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision" (R.

---

[8] We note that while Dr. Zimmanck reported discussing weight loss and exercise with Ms. Kuhn in 2011, it was only in the context of managing her high blood pressure and hyperlipidemia (*see, e.g.*, R. 323-37).

24). Ms. Kuhn contends that the ALJ did not adequately explain why she did not find her testimony about the extent of her limitations to be credible (Pl.'s Br. at 12).

It is well-settled that the ALJ's credibility determination should be upheld unless it is "patently wrong." *McHenry v. Berryhill*, 911 F.3d 866, 873 (7th Cir. 2018) (internal quotations and citations omitted). The Seventh Circuit has criticized statements by ALJs that claimants are "not fully credible" -- or, in this case, "not entirely consistent" -- but nevertheless has upheld credibility findings using these phrases where the ALJ otherwise adequately justified the determination. *See, e.g., Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018).

In this case, as the ALJ's review of her testimony demonstrates, Ms. Kuhn had little to say about the limiting effects of her impairments during the relevant time period before her DLI. Thus, the ALJ looked to other relevant evidence, including medical records showing improvement in Ms. Kuhn's condition and otherwise unremarkable findings, to support her conclusion that Ms. Kuhn did not suffer from severe impairments before her date last insured. The ALJ's credibility assessment was adequately explained and not patently wrong. *See Schloesser v. Berryhill*, 870 F.3d 712, 720 (7th Cir. 2017) (affirming Appeals Council's adverse credibility finding where Appeals Council provided adequate reasons, including claimant's infrequent treatment before his DLI and the unremarkable findings and improvement of his condition in the medical records); *see also Stepp*, 795 F.3d at 720-21 (upholding ALJ's partially credible finding where the ALJ acknowledged the claimant continued to report chronic pain throughout the adjudicative period but concluded that the record demonstrated improvement in the claimant's condition following surgery, medication changes, and therapy).[9]

---

[9] In her reply, plaintiff added a new argument: that the ALJ failed to explain why she rejected the state agency non-examining physician opinions that her hearing loss was severe (Pl.'s Reply at 7, citing R. 98-99). Arguments first raised in a reply brief are waived. *See, e.g., Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018). We note further

## CONCLUSION

For the foregoing reasons, we deny plaintiff's motion for remand (doc. # 15) and grant the Commissioner's motion to affirm the ALJ's decision (doc. # 23). The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATED: March 13, 2019

---

that the state agency physician opinions preceded Ms. Kuhn's amendment of her onset date from March 31, 2006 to January 1, 2011, more than 16 months after surgery was done to repair Ms. Kuhn's hearing loss in August 2009.